**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,  )<br>  )<br>  *Plaintiff,*  )<br>  )<br>  v.  )<br>  )<br> JEROME LUCKEY,  )<br>  )<br>  *Defendant.*  )<br>  )<br>  ) | No. 20 CR 313<br><br>Judge Virginia M. Kendall |

## MEMORANDUM OPINION AND ORDER

Defendant Jerome Luckey is charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). This charge resulted from an encounter with Illinois State Troopers on January 8, 2020. Illinois State Troopers first viewed a video of Luckey showing off a black semi-automatic handgun in his waistband and smoking suspected cannabis while they were using open-source social media on the Snapchat application.,. Using the geolocation data from the social media site which is also publicly available, the Troopers drove to the area where they suspected Luckey to be, saw him, approached him, and recovered a firearm that turned out to be the same firearm he displayed on social media. Luckey moves to suppress all evidence obtained as a result of the encounter arguing that the search and seizure was unreasonable. (Dkt. 17).

On October 27, 2020, this Court held an evidentiary hearing and heard testimony from the involved Illinois State Troopers and Brenette Simmons, Luckey's girlfriend who was not present when the events in question transpired. The parties were then given an opportunity to submit post-hearing briefing. After a review of the testimony, and evidence presented at the hearing, the Court credits the Troopers' version of events, and denies Luckey's motion.

## BACKGROUND

At the evidentiary hearing, the Court heard from Illinois State Troopers Matt Szluka and Kevin Weber, and Brenette Simmons. Their testimony was as follows:

### I. Luckey's Social Media Activities

On Wednesday, January 8, 2020, Illinois State Trooper Matt Szluka, reviewed publicly accessible videos posted to the Snapchat application in the vicinity of his patrol. Dkt. 24 at 11-12. Around 2:30 p.m., Trooper Szluka viewed an open-source Snapchat video ("Snapchat Video 1") of an individual who lifted his shirt, displaying a black semiautomatic handgun concealed in his waistband. *Id.*, at 12–13, 15. Snapchat Video 1 was timestamped 1:59 p.m. and was labelled "Luckey's Wednesday." *Id.* at 15–16. The individual in Snapchat Video 1 was wearing a white T-shirt, a Gucci-type belt, white pants, and Timberland boots. *Id.* at 16. Snapchat geo-location data, which is also publicly available, showed that Snapchat Video 1 was posted at approximately the 16700 block of Artesian Avenue, in Hazel Crest, Illinois. *Id.* at 13. Trooper Szluka alerted his colleague Trooper Kevin Weber to Snapchat Video 1 through their in-car computer system. *Id.* at 16. Troopers Szluka and Weber were stationed at the State Tollway Plaza, a few blocks away from the filming location of Snapchat Video 1. *Id.* at 13, 49.

Approximately 15 to 20 minutes later, around 2:45 to 2:50 p.m., Trooper Szluka observed a second Snapchat video, ("Snapchat Video 2"), also entitled "Luckey's Wednesday," which showed a man smoking and wearing a white T-shirt, Gucci-style belt, white pants, and Timberland boots, the same clothing as in Snapchat Video 1. *Id.* at 17. Snapchat Video 2 was also geo-tagged from the same location as Snapchat Video 1 and had a timestamp of 2:40 p.m. *Id.* at 17, 19. Trooper Szluka and Trooper Weber both testified that based on their training and experience, they

believed the man was smoking a blunt of cannabis. *Id.* at 17, 48. Trooper Szluka positively identified the individual depicted in Snapchat Video 2 as Jerome Luckey in court. *Id.* at 18.

Trooper Szluka and Trooper Weber subsequently met up in-person and reviewed Snapchat Video 1 and Snapchat Video 2. *Id.* at 19, 47–49. The Troopers set out to determine whether the armed individual legally possessed the firearm. *Id.* at 19. Troopers Szluka and Weber patrolled the area where Snapchat Videos 1 and 2 were posted, a two-block radius around 168th and Artesian Avenue. *Id.* The Troopers knew the neighborhood to be a moderate to high crime area due to their training and experience working in that area for the prior two years. *Id.* at 20, 49–50.

## II. The Troopers Approach of Luckey

Trooper Szluka patrolled in a public park just west of the 16700 block of Artesian Avenue. *Id.* at 22–23. At approximately 3:30 p.m., Trooper Szluka saw a man, identified in court as Luckey, wearing the same clothes he was wearing in Snapchat Videos 1 and 2. *Id.* at 22, 36. Trooper Szluka observed Luckey walk to the driver's-side door of a silver Chevy Impala parked on the driveway north of a residence on Artesian Avenue, 16792 Artesian Avenue (the "Artesian Residence"). *Id.* at 23–24.[1] Trooper Szluka then saw Luckey open the door of the Impala. *Id.* at 38. Trooper Szluka informed Trooper Weber through their car-to-car radio that he had seen the individual in the Snapchat video, Luckey, in the front yard of the address 16792 Artesian Avenue, by the driver's-side door of a silver Chevy Impala. *Id.* at 51. Trooper Szluka then drove with his sirens off through the public park and around the row of residences towards the Artesian Residence. *Id.* at 23.

When Trooper Szluka contacted Trooper Weber, Trooper Weber was approximately four to five houses south of the Artesian Residence. *Id.* at 51. Trooper Weber observed Luckey

---

[1] Brenette Simmon's, Luckey's girlfriend, rented the Artesian Residence at the time and Luckey would stay over roughly three to four times a week. *Id.* at 85

Page 3 of 15

standing by the driver's side door of a Chevy Impala and identified the him as the individual in the Snapchat Videos based on his clothing, which was a white t-shirt, white pants, and brown Timberland-style shoes. *Id*. at 52. The Chevy Impala was parked a foot or two west of the public sidewalk and the driver's door was open. *Id*. at 24–25; 52. Trooper Weber positively identified Luckey in court during the suppression hearing as the armed individual from the Snapchat Videos. *Id*. at 52. Trooper Weber parked his car in front of the Artesian Residence, exited his car, and approached Luckey. *Id*. at 56. As Trooper Weber approached, Luckey's back was facing him. *Id*. Based on the Snapchat videos, Trooper Weber believed that Jerome Luckey was armed, but did not know whether Luckey was a previously convicted felon or whether Lucky had a valid concealed carry license. *Id*. at 50, 55. Trooper Weber also did not know if Luckey was under the influence of marijuana, but was aware that Illinois's concealed carry law, 430 ILCS 66/70(d) prohibits individuals from being under the influence of drugs while carrying a concealed firearm. *Id*. at 50.

Trooper Weber approached Luckey without backup from Trooper Szluka because he wanted to use the element of surprise and was concerned that Luckey could have entered the car, fled the scene, or ran back in the house. *Id*. at 57. Trooper Weber stated that his State Police training taught him to approach individuals if he believed they are armed with a firearm with caution and to issue clear, direct orders. *Id*. at 46. Trooper Weber identified himself by stating, "This is the Illinois State Police" and instructed Luckey to "Show me your hands." *Id*. at 56, 72. Trooper Weber instructed Luckey to show his hands because he believed Luckey was armed. *Id*. at 56. Rather than show his hands, Luckey did not immediately respond to Trooper Weber's instructions and instead immediately reached into his waistband with his right hand and pulled a firearm out. *Id*. at 57–58, 73, 79–80.

Trooper Weber clearly saw the black handgun Luckey pulled from his waistband. *Id.* at 80. Trooper Weber saw Luckey then toss the handgun on the driver's-side seat of the Chevy Impala, though the open door of the car. *Id.* at 58. Trooper Weber stated he found this behavior suspicious, concluding that Luckey "did not want to be caught in possession of the firearm." *Id.* at 59–60. In response to Luckey's actions, Trooper Weber pulled his own firearm and reinstructed Luckey to show his hands, told him to keep his hands raised, and then verbally directed him away from the vehicle and the handgun, which was accessible. *Id.* at 60. Trooper Weber then placed Luckey in handcuffs, in the front lawn of the house. *Id.* at 60–61. Trooper Weber detained Luckey for safety because of Luckey's failure to show his hands and because he pulled his firearm from his waistband and tossed it into the Chevy Impala. *Id.* at 61, 80.

### III.    Retrieval of Luckey's Firearm

After Trooper Weber placed Luckey in handcuffs, the firearm was still on the driver's seat of the Chevy Impala with the car door open, which presented a safety concern to Trooper Weber because the gun was easily accessible and he did not know if the gun was loaded. *Id.* at 60–61, 63. While Trooper Weber was detaining Luckey, three individuals exited the front door of the Artesian Residence and were approximately 10 feet away from the gun in the Impala. *Id.* at 26-27, 62. Trooper Szluka, who had arrived at the residence by this time, ordered those individuals to go back inside, which they did. *Id.* at 26, 27. Trooper Weber testified that he was trained to ensure safety when interacting with armed individuals by making sure that any firearms on the scene were cleared and out of reach of any individuals on the scene and he went to the Chevy Impala and saw the gun on the driver's seat in plain view. *Id.* at 46, 63. Troopers Weber and Szluka believed they had an immediate need to retrieve the firearm for safety reasons. *Id.* at 28, 64. Trooper Weber subsequently reached into the open door of the Chevy Impala and retrieved

the firearm, which was a black .380 caliber Smith & Wesson with night sights, matching the appearance of the gun in Snapchat Video 1. Id., at 63–64; 81–82. Trooper Weber did not search any other part of the car aside from an immediate search of the driver's side area. *Id.* at 64. Trooper Weber reached in the open door of the Chevy Impala and retrieved the firearm. *Id.* at 63.

Trooper Szluka asked Luckey if he had a concealed carry license or a Firearm Owner Identification card and Luckey responded that he did not. *Id.* at 27, 40–41. Trooper Weber was retrieving the gun and did not hear this conversation. *Id.* at 76, 81. After securing the gun, Trooper Weber made the firearm safe by removing the magazine and ensuring there were no rounds in the chamber. *Id.* at 30. Troopers Szluka and Weber then brought Luckey to Trooper Weber's patrol car, conducted a custodial search of Luckey, and placed him in the patrol car for transport. *Id.* at 28. Trooper Weber also read Luckey his Miranda rights. *Id.* at 65. During later questioning, Luckey admitted that he was a convicted felon and admitted to his possession of the firearm. *Id.* at 65. Luckey claimed that he was placing the firearm in the Chevy Impala for his girlfriend, but his girlfriend testified that she was unaware that Luckey had a gun and denied asking him to place it in the vehicle. *Id.* at 66, 87–89.

## DISCUSSION

Defendant raises two main arguments in his Motion to Suppress. Luckey argues first that the search was illegal because the "Illinois State Troopers recovered evidence, including a firearm, from an area over which Jerome Luckey had a reasonable expectation of privacy." (Dkt. 17 at ¶ 7). Second, Luckey argues that the search and seizure were without objective justification, probable cause, or reasonable suspicion.[2] As discussed further below, because the search and

---

[2] The Court notes that Luckey does not dispute that the Troopers were justified in investigating the potential crime based off Luckey's Snapchat videos. Luckey writes, "[o]f course, the Troopers are entitled to investigate the lawfulness of an act of possessing a firearm," and "the zeal and diligence of the officers in ferreting out potential crime was commendable…" (Dkt. 28 at 8, 9).

seizure were justified under *Terry v. Ohio*, 392 U.S. 1 (1968) and because Luckey's arrest was justified by probable cause, Luckey's Motion to Suppress is denied.

## I. Luckey Had No Reasonable Expectation of Privacy

Luckey's first grounds for suppression is that he had a reasonable expectation of privacy at the Artesian Residence, the home where his girlfriend, Brenette Simmons, lived and where he claims he stayed several nights a week.

It is undisputed that both Troopers first observed Luckey while standing in the driveway of the Artesian residence next to the silver Chevy Impala. Dkt. 24 at 23–25; 52. Additionally, the initial *Terry* stop of Luckey, the observation and retrieval of Luckey's firearm from the Chevy Impala, and Luckey's subsequent arrest all took place outside of the Artesian Residence in the driveway. *Id.* at 58, 60–61. Putting aside the fact that Luckey does not lease, own, or live at the Artesian Residence, Luckey had no reasonable expectation of privacy because "[p]rivate driveways generally are deemed public places for Fourth Amendment purposes." *Kmetz v. Zenz*, 215 F.3d 1330 (7th Cir. 2000); *see also United States v. French*, 291 F.3d 945, 953 (7th Cir. 2002)("…public drives, sidewalks, or walkways are not within the curtilage of the home when they are not enclosed by a gate or fence); *Bleavins v. Bartels*, 422 F.3d 445, 454–55 (7th Cir. 2005) ("generally, there is no expectation of privacy in a driveway, particularly where…it is open to observation and use by the public"); *United States v. Evans*, 27 F.3d 1219 (7th Cir.1994) (FBI agent with open view of the interior of defendant's home from the defendant's driveway had not made his observation from within the home's curtilage).

Because Luckey was observed in the driveway, he had no reasonable expectation of privacy. Even if the subsequent *Terry* stop, which, as discussed below, was justified by reasonable suspicion, had occurred in the curtilage of Simmons's home, the Fourth Amendment allows

justified *Terry* stops to occur in the curtilage of an individuals' home. *See United States v. Richmond*, 924 F.3d 404, 412 (7th Cir. 2019) (finding a lawful *Terry* search on defendant's front porch after officers suspected defendant had a firearm). Given that Luckey was observed and stopped in the driveway, which is deemed a public place, he had no reasonable expectation of privacy.

Luckey also suggests that he had a reasonable expectation of privacy in the Chevy Impala, a vehicle owned by Simmons. Luckey claims he had a reasonable expectation of privacy in the Impala because he drove it regularly with permission, kept his cigarettes there, and he discarded his firearm there when confronted by the police. Yet the primary issue with this argument is that the Troopers did not search the vehicle for the firearm within the meaning of the Fourth Amendment. The door to the vehicle was open and the Troopers could see the gun in plain view. Dkt. 24 at 60–61, 63. The Plain View doctrine holds that "there is no legitimate expectation of privacy … shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers." *United States v. Williams*, 495 F.3d 810, 815 (7th Cir. 2007) (citing *Texas v. Brown*, 460 U.S. 730, 740 (1983)); *United States v. Ware*, 914 F.2d 997, 1000 (7th Cir. 1990) ("there is no expectation of privacy and thus no 'search' when a person merely observes something through an automobile window"). Additionally, as discussed further below, the search for the firearm was justified by reasonable suspicion the *Terry* stop.

## II.     Luckey's Search and Seizure was Justified by *Terry*

Luckey next argues that his search and seizure occurred without objective justification, reasonable suspicion or probable cause. *Terry* "authorizes a brief investigatory detention of an individual whom the police reasonably suspect, based on specific and articulable facts, of engaging in criminal activity." *U.S. v. Snow*, 656 F.3d 498, 500 (7th Cir. 2011). Reasonable suspicion "is more than a hunch but less than probable cause and considerably less than preponderance of the evidence." *Id.* (quoting *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008)) (internal quotation marks omitted). Whether suspicion of criminal activity is reasonable calls for "an objective inquiry into all of the circumstances known to the officer at the time he stopped the defendant, including information relayed to him by fellow officers and police dispatchers." *Id.* Some factors courts look at include the "experience of the law enforcement agent and the behavior and characteristics of the suspect" and whether the location of the stop is a "high crime area."" *United States v. Jackson*, 300 F.3d 740, 746 (7th Cir. 2002) (citations omitted).

Luckey argues that he was seized when Trooper Weber entered onto the property, "snuck up from behind him," announced he was Illinois State Police, and then commanded him to show his hands, which prompted Luckey to retrieve the firearm from his waistband and drop it on the seat of the Chevy. (Dkt. 28 at 6–7). As Defendant recognizes, "a person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave. Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of weapon by the officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that

compliance with the officer's request might be compelled." *U.S. v. Mendenhall*, 446 U.S. 544, 554 (1980); *see also California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("an arrest requires either physical force…or, where that is absent, submission to the assertion of authority").

Defendant argues that he was seized when Trooper Weber initially entered onto the property and instructed Luckey to show his hands, but then admits in the same sentence that he did not comply with Trooper Weber's order to show his hands, instead pulling the firearm from his waistband and dropping it into the Chevy Impala. This definitively undermines Luckey's argument he was seized at the time Trooper Weber stepped onto the property. *United States v. Griffin, 652 F.3d 793*, 798 (7th Cir. 2011) ("a 'show of authority' alone is insufficient; an officer's show of authority becomes a seizure only if the person at whom it is directed actually submits to that authority.") That Luckey did not feel compelled to listen to Trooper Weber's instruction indicates that he was not seized.

Instead, the *Terry* stop commenced once Trooper Weber drew his firearm, instructed Luckey to step away from the vehicle, and handcuffed Luckey. The question then, is whether the *Terry* stop was justified by reasonable suspicion under the circumstances. *Snow*, 656 F.3d at 500. Here, Trooper Weber had seen Luckey in possession of a firearm, thought it suspicious that Luckey would toss his firearm away, was aware that this was a moderate to high crime area, and was further aware that Luckey, who was armed, had been smoking something that appeared to be cannabis, based on the public Snapchat video Luckey had posted within the hour. Dkt. 24 at 59–61; 80. The totality of the circumstances described justifies that Trooper Weber acted with reasonable suspicion as all of these factors are lawful considerations accepted by courts. *See e.g. Snow*, 656 F.3d at 500; *Jackson*, 300 F.3d at 746 (7th Cir. 2002). Although he did not know at the time that Luckey was a convicted felon, he had observed him just minutes before smoking a

"blunt" or what he believed was cannabis and it would be have been illegal to possess the gun while under the influence of drugs. Law enforcement officers are trained to take into account all of the circumstances they are facing in order to determine if illegal actions are taking place and the Terry stop is exactly the tool that officers may legally use to meet that goal.

Once the officer had received no compliance from Luckey, the situation became more dangerous. When Luckey pulled the gun from his waistband rather than placing his hands in the air, he was fortunate that the officer remained restrained and did not shoot. The situation was extremely dangerous at that point. It was perfectly appropriate for the officers to search the car once the weapon was thrown inside of it. Searches of the arrestee and the immediate area are allowed by *Terry* because the arrestee, "who may not himself be armed, may be able to gain access to weapons to injure officers or others nearby, or otherwise to hinder legitimate police activity." *Richmond*, 924 F.3d at 413; *see also United States v. Vaccaro*, 915 F. 3d 431, 437 (7th Cir. 2019) (upholding *Terry* search of defendant's car for weapons because officers believed that defendant could gain immediate control of weapons in the vehicle, despite the fact that defendant was handcuffed). However, the search is a serious intrusion so it "must 'be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs or other hidden instruments for the assault of the police office." *Id*. at 414 (citing *Jackson*, 300 F.3d at 746). Therefore, under *Terry*, an officer may conduct a protective search for weapons of an individual's person, "and area within his control," if "'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *Id*. (quoting *Cady v. Sheahan*, 467 F.3d 1057, 1061–62 (7th Cir. 2006)).

As discussed above, Trooper Weber had reasonable suspicion to conduct his initial *Terry* stop. The subsequent search and recovery of the gun were also justified by *Terry* because Trooper

Weber viewed the gun, knew that Luckey could retrieve the gun, and there were three individuals who exited the Artesian residence and were standing within 10 feet of the gun. Dkt. 24 at 64. Trooper Weber testified that he thought he needed to retrieve the gun immediately "for safety for myself and safety for passer-bys and anyone within the community." *Id*. Under *Terry*, the recovery of Luckey's firearm was justified because the gun was in an area within Luckey's control. Further, Trooper Weber was justified because he acted as a reasonably prudent person by fearing for his safety as there was a firearm within reach of third-parties.[3]

## IV. Probable Cause Existed to Arrest Luckey and to Search the Vehicle

Finally, the Government argues the Troopers had sufficient probable cause to arrest Luckey. As discussed above, the Trooper's initial questioning and detaining of Luckey was justified under *Terry*. The Government argues the *Terry* stop did not transform fully until an arrest until the officers brought Luckey to the patrol car for transport. The question of whether a *Terry* stop has turned into an arrest is a fine line: "[s]ubtle, and perhaps tenuous, distinctions exist between a *Terry* stop, a *Terry* stop rapidly evolving into an arrest and a de facto arrest" and given this, there is no "litmus-paper test for determining when a seizure exceeds the bounds of an investigative stop" and becomes an arrest." *United States v. Tilmon*, 19 F.3d 1221, 1224 (7th Cir. 1994) (internal citations and quotations omitted). An officer has probable cause to arrest "if he has reason to believe, in light of the facts known at the time, that the suspect has committed or is about to commit a crime." *Gonzalez v. Village of W. Milwaukee*, 671 F.3d 649, 655 (7th Cir. 2012)

---

[3] The Court notes that Trooper Weber's recovery of Luckey's firearm was also justified by exigent circumstances. A court "evaluates a claim of exigent circumstances from the perspective of the police officer at the scene to determine whether the police had a reasonable belief that there was a compelling need to act quickly and that there was no time to obtain a warrant. Exigent circumstances exist when there is a reasonable belief by police that their safety, or the safety of the public, may be threatened. *United States v. Webb*, 83 F.3d 913, 916 (7th Cir. 1996). Here, Luckey tossed his firearm into an open vehicle parked in the driveway, close to the house where three bystanders emerged. The vehicle was also located close to the public sidewalk. Although Trooper Weber's recovery was thoroughly justified under *Terry*, he would also have been justified by exigent circumstance.

(citing *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008)). As the name itself suggests, "probable cause deals not with hard certainties but with probabilities." *Abbott v. Sangamon County*, 705 F.3d 706, 714 (7th Cir. 2013) (citing *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). "Determining whether an officer had probable cause to arrest entails a purely objective inquiry; the officer's subjective state of mind and beliefs are irrelevant." *Id*. (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). Probable cause is ultimately a "fluid concept based on common-sense interpretations of reasonable police officers as to the totality of the circumstances at the time of arrest." *United States v. Shields*, 789 F.3d 733, 746 (7th Cir. 2015) (quoting *United States v. Breit*, 429 F.3d 725, 728 (7th Cir. 2005)

Trooper Weber had probable cause that Luckey illegally possessed the firearm at the time he witnessed Luckey toss the firearm into the Chevy Impala and was therefore authorized to make the subsequent arrest. A defendant's toss of a gun in response to the presence of law enforcement is sufficient to create probable cause that defendant did not legally possess the firearm. *See e.g. United States v. Williams*, 333 Fed. App'x 127, 128 (7th Cir. 2009) ("once the officers saw the gun thrown, they had probable cause to make an arrest"); *United States v. Sawyer*, 224 F.3d 675 (7th Cir. 2000) (as long as [the officer] reasonably believed there was a substantial chance that the object [defendant] dropped was a firearm, he had probable cause to arrest [defendant]." Here, Trooper Weber had reasonable suspicion that Luckey possessed a firearm based on his Snapchat videos. When Trooper Weber approached Luckey, Luckey immediately drew his firearm and tossed it into the Chevy Impala and refused to comply with Trooper Weber's order to show his hands. Dkt. 24 at 58 – 60, 80. Trooper Weber had a clear view of all of this. *Id.* at 80. The throwing of the gun in response to Trooper's Weber command gave rise to probable cause to authorize Luckey's arrest because that action suggested that Luckey either had committed or was

about to commit a crime. *Gonzalez*, 671 F.3d at 655. Additionally, Trooper Weber had probable cause that Luckey violated 625 ILCS 5/11- 203, which prohibits a person from willfully failing or refusing to comply with any lawful order or direction of any police officer due to Luckey's failure to immediately show his hands when instructed. *See Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender.")

The probable cause that Luckey illegally possessed the firearm also justified the search of the vehicle. After witnessing Luckey throw the gun into the Chevy Impala, Trooper Weber retrieved the firearm and did not search any other part of the vehicle except the immediate driver's side area. Dkt. 24 at 63–64. This search was limited and was also justified as a protective search under *Terry*. The search was additionally supported by the automobile exception. The automobile exception "permits the police to search a vehicle if there is probable cause to believe it contains evidence of criminal activity." *United States v. Charles*, 801 F.3d 855, 860 (7th Cir. 2015); *see also United States v. Reaves*, 796 F.3d 738 (7th Cir. 2015) (Under the automobile exception, law enforcement officers "do not need a warrant to search a vehicle when they have probable cause to believe it contains evidence of criminal activity")(citations omitted). When probable cause exists to search a vehicle, the authority to search "encompasses any area of the vehicle where evidence of the crime might be found," including "containers within the vehicle that could hold such evidence." *Charles*, 801 F.3d at 860.

Trooper Weber witnessed Luckey throw the gun into the vehicle after he approached and announced himself. Dkt. 24 at 56–58, 73, 79–80. Trooper Weber had probable cause that Luckey did not lawfully possess the gun and that the Chevy Impala contained evidence, i.e. the gun, of

Luckey's crime. The totality of the facts and circumstances created probable cause that the firearm was in Luckey's car and justified a warrantless search of the car.

Finally, Trooper Szluka testified that while Trooper Weber was securing the firearm from the Chevy Impala, he asked Luckey if he had a concealed carry license or a Firearm Owner Identification Card and Luckey responded that he did not. Dkt 24 at 27, 40–41. This provided further probable cause to make an arrest. Under the totality of the circumstances, and in light of the fact that the Troopers had probable cause that Luckey had committed a crime, Trooper Szluka placed Luckey under arrest.

## CONCLUSION

For the foregoing reasons, the Court concludes that the stop and seizure of Luckey was lawful under the Fourth Amendment. Luckey's Motion to Suppress [Dkt. 17] is therefore denied.

_____
Virginia M. Kendall
United States District Judge

Date: January 27, 2021